**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHRISTOPHER G. TOTLEBEN,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **CA 05-310Erie** |
| **JO ANNE B. BARNHART, Commissioner of Social Security,** | ) | |
| **Defendant.** | ) | |

**OPINION**

COHILL, D.J.

Christopher G. Totleben ("Claimant") here appeals the Commissioner's denial of his claim for disability benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§401-433, 1381-1383f. Specifically, Totleben appeals the determination that he is not disabled because, even with his non-exertional limitations, he can perform work that exists in significant numbers in the national economy. Before the Court are cross-motions for summary judgment filed by the parties to this appeal pursuant to Fed. R. Civ. P. 56. We have jurisdiction under 42 U.S.C. § 405(g).

Having considered the arguments of the parties, the administrative record, and the applicable law, for the reasons set forth below we will grant summary judgment in favor of the Commissioner and against the Claimant.

## I. Background

Christopher Totleben was forty-nine years old at the time of the hearing. He is a high school graduate, and has previous work experience as an auto body painter and industrial painter. (Tr. 16). In April of 2003 he suffered a stroke, but has since regained full use of his body. (Tr. 241). After the stroke, Totleben began having the seizures, headaches, and depression, which are the basis for his disability claim.

Totleben filed an application for SSI on October 2, 2003, and an application for DIB on

October 14, 2003, alleging disability as of August 15, 2001 due to a history of stroke and seizures. (Tr. 54-57, 227-28). At the administrative hearing, this onset date was amended to September 20, 2003. (Tr. 15). These claims were denied on December 16, 2003. (Tr. 36-37).

Totleben's claims were heard by Administrative Law Judge ("ALJ") Michael F. Colligan on February 3, 2005. (Tr. 234-252). Claimant was represented by counsel and testified at the administrative hearing. He stated that he had a stroke in April of 2001, but has regained full use of his body since then. (Tr. 241). He takes medication for his seizures, and testified that "I believe it's fairly under control." (Tr. 240). He has been seizure free for the past four years. (Tr. 240). He explained that he is honest about his health problems when he applies for jobs, and that employers never call him back because he has a seizure disorder. [1] (Tr. 241).

He is on nine medications, and usually goes to sleep about three times a day. (Tr. 245). He also has headaches "[a] couple of times a week" which last for twenty or thirty minutes. (Tr. 246). He sees a doctor for depression. (Tr. 246-47). He doesn't get along with people very well, and likes to work by himself. (Tr. 247-48).

**Medical Records**

Claimant's primary care physician is Merja Wright, M.D. (Tr. 145-157; 174-204; 223). She began treating Totleben after his stroke. She referred him to neurologist Laura Hershkowitz, D.O. (Tr. 127-137; 205-222). Medical records from May 2003 show that Claimant's seizures were under control through medication. (Tr. 129). The effects of his stroke were "mostly resolved" by July 14, 2003. (Tr. 192). EEG tests performed in July 2002 and in July 2003 were "normal," and a CT scan performed in July 2003 showed no new infarct, mass, midline shift, or intracerebral hemorrhage of the brain. (Tr. 110, 124, 234-35).

On August 20, 2003, Claimant complained to Dr. Wright of headaches and

---

[1] Such conduct on the part of a prospective employer does not establish that a Claimant is disabled under the regulations. 20 C.F.R. §§ 404.1566(c), 404.966(c).

disorientation, and reported having had a seizure in late July. (Tr. 186-88). Dr. Hershkowitz examined him on September 24, 2003, and noted that he had had seizures in July and August. (Tr. 210). She reported that he was alert, interactive, and stable, with mild left hemispheric deficits, and made some adjustments in his medication. (Tr. 210).

On October 10, 2003, Sukh D. Sharma, M.D., examined the Claimant for cardiac problems after he complained of chest pains. (Tr. 139-40). Dr. Sharma noted that Totleben's jugular venous pressure was normal; his carotids were free of bruits; his heart had no murmur, gallops, or rubs; his breathing was free of wheezes and rales; and he had no edema. (Tr. 140). His EKG was normal, and he achieved 13 METS during his stress test, indicating that there was no limitation on his physical activity. *Guides to the Evaluation of Permanent Impairments*, 170-71 (American Medical Assoc. 4th Ed. 1995).

On October 29, 2003, Dr. Wright noted that the Claimant had not had "any seizure type activity at all" and was feeling "okay" with his medications. (Tr. 146). After another examination on December 3, 2003, Dr. Wright recorded that Totleben was feeling "reasonably well" on his medications. (Tr. 183). He was having headaches, but the examination was normal. (Tr. 183).

A state agency physician, K. Loc Le, M.D., reviewed Claimant's records on December 9, 2003, and stated that Totleben could perform light work. (Tr. 158-65).

Claimant sought treatment for depression at Stairways Behavioral Health Outpatient Clinic in January 2004. Sean Su, M.D. is Claimant's treating psychiatrist at Stairways. A psychiatric evaluation performed on February 3, 2004, shows that Totleben reported feeling severely depressed and questioned whether he had "anything to live for" but denied having any suicidal ideation. (Tr. 169-71). He stated that his depression and mental health problems occurred after his stroke. (Tr. 169). Dr. Su reported that Claimant's mental status was awake and alert, and that he was oriented to person, place, and time. His speech was coherent and goal-directed. His long-term and short-term memory were generally intact. He appeared to

have average intelligence, and his insight and judgment were generally fair. (Tr. 170). Dr. Su's diagnosis was major depressive disorder and seizure disorder. His global assessment function ("GAF") was 45-50. [2] (Tr. 171). Dr. Su prescribed Lexapro for depression, and recommended continued outpatient psychiatric treatment. (Tr. 171).

Dr. Wright noted in March 2004 that the Claimant was feeling drowsy, although an examination revealed no abnormalities and she found that Totleben was "more animated" than usual. (Tr. 180). On March 24, 2004, Dr. Hershkowitz reported that Totleben's headaches were "better" and that there had been no seizure activity since medications were adjusted in September. (Tr. 209). Totleben reported that he was sleeping during the day, but not sleeping at night. (Tr. 209). Claimant was alert, oriented, and interactive; he had clear speech, 5/5 motor strength, and a stable gait; he had mild processing problems. (Tr. 209).

Lexapro was discontinued because it made the Claimant sleepy, and Dr. Su prescribed Effexor in April. (Tr. 167-68). On April 28, 2004, Dr. Wright noted that Claimant's mood had improved, and that he was not experiencing problems with his medications. (Tr. 179). On May 11, 2004, Dr. Su reported that he was "doing better" aside from some complaints of drowsiness. (Tr. 166). His mood was more stable.

On June 16, 2004, Dr. Wright examined the Claimant and noted no abnormalities. He was feeling "abandoned" because the community health net neurology clinic where he saw Dr. Hershkowitz had closed, and he was unable to get in touch with her. However, he was still getting his medications, and was not having any seizure-like symptoms. (Tr. 178).

On August 10, 2004, Dr. Su prepared a mental abilities form, which indicated that the Claimant was able to remember work instructions; could understand, remember, and carry out simple instructions; and could ask simple questions. (Tr. 173). However, in Dr. Su's opinion

---

[2] A GAF in the 41-50 range indicates serious problems (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text revision, 2000).

Totleben would be unable to maintain attention for extended periods, maintain regular attendance, make simple decisions, or complete a normal workday without an unreasonable number and length of rest periods. He would have difficulty responding appropriately to supervisory criticism, and getting along with co-workers. (Tr. 173).

Dr. Hershkowitz again examined the Claimant on November 17, 2004. (Tr. 205-207). Totleben complained of headaches but had stopped taking the medications for them. (Tr. 205). He was having problems with his memory, and reported that he had had a seizure the previous month. However, the physical examination revealed no abnormalities, and a neurological motor examination showed symmetrical, 5/5 motor strength with normal bulk and tone, intact senses, 2/4 reflexes in the upper extremities and 3/4 in the knees, and a stable gait. (Tr. 206). Dr. Hershkowitz increased his seizure medication and increased the Effexor for his headaches. (Tr. 206).

By letter to Claimant's counsel dated December 7, 2004, Dr. Wright stated that Totleben was adequately medicated and therefore his seizures were reduced, but that he complained of tiredness and headaches from the medication (Tr. 223).

**The ALJ's Decision**

A vocational expert testified that considering Claimant's age, educational background, work experience, and residual functional capacity, he would make a successful adjustment to work as a surveillance systems monitor, unarmed guard, and document preparer. (Tr. 249-252).

The ALJ left the record open for thirty days for further medical information. (Tr. 252).

By decision dated February 3, 2006, Totleben's claims were denied. (Tr. 15-27). The ALJ concluded that Totleben had severe impairments which do not meet or equal the criteria of listed medical impairments. (R. 26 findings 3, 4). The ALJ found that Claimant's testimony regarding his limitations was not fully credible. (Tr. 26 finding 5). The ALJ concluded that Totleben has no exertional limitations, but that his seizure disorder requires precautions such as avoiding heights and moving machinery, and avoiding climbing ladders, ropes, and scaffolds.

He also has non-exertional restrictions due to residuals of his stroke, seizures, and depression, which limit him to simple routine repetitive tasks and minimal contact with the public. (Tr. 26-27, finding 6). Therefore, the ALJ concluded that the Claimant was not disabled within the meaning of the Act. (Tr. 27 finding 11).

The Appeals Council declined to review the ALJ's decision, and this civil action followed.

## II. Standard of Review

The standard of review used by this Court in reviewing the decision of the Commissioner in social security cases is whether substantial evidence exists in the record to support the decision. *Allen v. Bowen*, 881 F.2d 37, 39 (3d Cir. 1989). Judicial scope of review of a social security case is based upon the pleadings and transcript of the record. 42 U.S.C. § 405(g). We review the Commissioner's decision only to determine whether she applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. *Schaudeck v. Commissioner of Social Sec. Admn.*, 181 F.3d 429, 431 (3d Cir. 1999). The Commissioner's findings of fact, if supported by substantial evidence, are conclusive. 42 U.S.C. § 405(g); *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999); *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). We may not undertake a *de novo* review of the decision, and may not reweigh the evidence of record. *Monsour Medical Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).

"Substantial evidence 'does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999) (quoting *Pierce v. Underwood*, 487 U.S. 552 (1988)). Substantial evidence has been defined as more than a mere scintilla. *Plumer*, 186 F.3d at 427; *Hess v. Secretary*, 497 F.2d 837, 838 (3d Cir. 1974). Evidence is not substantial if the Commissioner fails to resolve conflicts created by countervailing evidence, particularly that of treating physicians, or if it is not evidence but mere

conclusion. *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). The Commissioner may accept or reject testimony or other evidence, but is not free to mischaracterize the evidence or to reject it for no reason or for the wrong reason. *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993).

To be eligible for social security disability benefits, a plaintiff must demonstrate an inability to engage in substantial gainful activity because of a medically-determinable physical or mental impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A); *Brewster v. Heckler*, 786 F.2d 581, 583 (3d Cir. 1986).

To facilitate the disability determination, the Commissioner has set forth a five-step sequential analysis for an ALJ to use when evaluating the disabled status of a claimant. 20 C.F.R. § 404.1520(a); *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991). The ALJ must determine (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if the claimant has a severe impairment, whether it meets or equals the criteria listed in 20 C.F.R., pt. 404, subpt. P., app. 1; (4) if the impairment does not satisfy one of the impairment listings, whether the claimant's impairments prevent the performance of past relevant work; and (5) if the claimant is incapable of performing past relevant work, whether he can perform any other work that exists in the national economy, in light of his age, education, work experience, and residual functional capacity ("RFC"). 20 C.F.R. § 404.1520.

The claimant carries the initial burden of demonstrating by medical evidence that she is unable to return to his previous employment. *Dobrowolsky*, 606 F.2d at 406. Once this burden is met, the burden of proof shifts to the Commissioner to show that the claimant can engage in alternative substantial gainful activity. *Id.*

We have carefully reviewed the entire record and will not reweigh the evidence of record. *Monsour Medical Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).

**III. Analysis**

Applying this five-part framework to the Claimant's case, the ALJ found that the Claimant has not engaged in substantial gainful activity during the relevant period. ( Tr. 26). The residuals from the cerebrovascular accident and seizure disorder, and his depressive disorder, are severe impairments that do not meet or medically equal one of the listed impairments in appendix 1, Subpart P, Regulation No. 4. ( Tr. 26). He is unable to perform his past relevant work. (Tr. 27). However, he is able to make a vocational adjustment to work as surveillance systems monitor, unarmed guard, and document preparer. (Tr. 27). Accordingly, the ALJ found that Totleben was not disabled. (Tr. 27).

The Claimant argues that the ALJ improperly assessed evidence relating to Claimant's headaches, fatigue, seizures, episodes of disorientation, and depression. We have reviewed the record in this case and conclude that there is substantial evidence to support the ALJ's decision.

The records of both treating physicians since September 2003 indicate that Totleben complained about headaches and fatigue, and that his neurologist tried different medications and dosages to treat the headaches and tiredness (or, in the case of Elavil, wakefulness) that resulted from his anti-seizure medications. Treatment notes support the ALJ's conclusion that although the Claimant was having headaches, he was not experiencing them as frequently as he claimed at the hearing.

The record also establishes that his seizures were well controlled by medication. Indeed, the Claimant himself testified that he had not had seizures for the four years he had been taking his current medication. And, although Totleben remains depressed, the record shows that medication has stabilized this condition, as well.

The Claimant argues that the ALJ ignored Dr. Su's August 2004 assessment of his "Mental Abilities and Aptitudes Needed to Do Unskilled Work," in which the doctor indicated that Totleben would be unable to maintain attention for extended periods, maintain regular attendance at work, make simple decisions, or complete a normal workday without

unreasonable rest periods; and that he would have difficulty with supervisory criticism and getting along with his co-workers. However, the ALJ did consider this assessment, and explained that he was giving it little weight because it was merely a check-box form report devoid of any explanation or rationale for its conclusions. An ALJ may give such form reports little or no weight. *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993). Moreover, the ALJ noted that the report was not supported by Dr. Su's psychiatric evaluation or progress notes. A treating physician's report may be discounted where it is inconsistent with other medical evidence in the record. 20 C.F.R. § 416.927(d)(2).

The ALJ also considered, and discounted, Dr. Su's initial conclusion that Totleben had a GAF of 45-50. The ALJ explained that the GAF is a subjective assessment, and noted that at the same initial examination the Claimant denied having any suicidal ideation, was alert and oriented to person, time and place, denied having any hallucinations, and exhibited no significant obsessions or compulsions. At his next appointment with Dr. Su, on May 11, 2004, the Claimant again denied any suicidal or homicidal ideation. He was doing well on the medication and his mood was more stable. We find that the ALJ properly considered the GAF score in the context of Dr. Su's entire initial examination and the subsequent medical record, and his decision to discount it is supported by substantial evidence.

The ALJ accounted for Totleben's non-exertional limitations, including mild perception and memory problems, occasional headaches, depression, and fatigue secondary to his multiple medications, when he found that the Claimant would have "moderate" difficulty in maintaining sustained concentration, persistence, and pace. Accordingly, he limited Totleben to simple, routine, repetitive tasks. and to minimal contact with others.

The Claimant further asserts that the ALJ improperly concluded that Totleben's testimony that his symptoms were debilitating was not fully credible. Our review of an ALJ's credibility determinations is deferential, because the ALJ is in the best position to assess the Claimant's testimony. In this case, Totleben testified that he had regained full use of his body

after the stroke, and that he had not had a seizure since starting his new medication four years previously. Progress notes from Dr. Wright and Dr. Hershkowitz during the relevant time period indicate that his headaches and fatigue are related to his medications, which his physicians continue to adjust, and do not support a conclusion that he is disabled. We find that the ALJ properly concluded that the record did not support Totleben's testimony that his headaches and fatigue were debilitating.

**Conclusion**

For the reasons set forth above, we find that the ALJ properly weighed the evidence of record, and his determination that the Claimant is not disabled within the meaning of the Act is supported by substantial evidence. Accordingly, we will grant summary judgment in favor of the Commissioner and against the Claimant. An appropriate Order follows.

March 5, 2007
Date

Maurice B. Cohill, Jr.
Maurice B. Cohill, Jr.
Senior United States District Court Judge